J-S40019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: CONTEMPT OF COURT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: RICHARD J. MCCAGUE | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1768 WDA 2018 |

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-MD-0005473-2018

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and PELLEGRINI*, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED OCTOBER 29, 2019**

Richard J. McCague appeals from the order finding him in direct criminal contempt and ordering him to pay $4,847.02, the cost of a new trial. McCague argues the trial court abused its discretion when it found him in contempt and that the sanction imposed for the contempt was excessive. We affirm.

The trial court set forth the factual and procedural history of this case, which we adopt and incorporate herein. Trial Court Opinion, filed Apr. 10, 2019, at 2-9 ("1925(a) Op."). We summarize the history briefly here. McCague represented Richard DeSabetino in a separate criminal matter. DeSabetino had had numerous appointed counsel, and McCague entered his appearance as private counsel approximately two months before DeSabetino's trial was to begin. N.T., 11/15/18, at 4-6. The court informed DeSabetino and McCague that the trial would not be continued, as four years had passed since the origination of the case. *Id.* at 6-7.

_____

* Retired Senior Judge assigned to the Superior Court.

Jury selection occurred on October 22, 2018, and the trial started the next day. *Id.* at 7-8. The Commonwealth called Amy Calabrese ("witness"), who lived with DeSabetino at the time of the incident at issue in DeSabetino's case, and who was an eyewitness. *Id.* at 9. The Commonwealth conducted its direct examination. *Id.* After the direct, but before the cross-examination, McCague informed the court, "I do represent [the witness] on another case." 1925(a) Op. at 4.[1] The court recessed. When it returned it stated that the issue is that McCague "represents – I believe that was said in the present tense – the Commonwealth's main witness." *Id.* McCague did not object or attempt to correct this statement. After further discussion, the trial court declared a mistrial.

In October 2018, the trial court issued a rule to show cause as to why it should not hold McCague in contempt. The court held a hearing at which McCague claimed that Calabrese had only been a prospective client, and that he had not agreed to represent her. N.T., 11/15/18, at 12-13. He claimed he met with her to discuss representing her at a *Gagnon II*[2] hearing, but that he declined because she would not be able to pay him. *Id.* at 13. McCague also presented a letter that he allegedly sent to the witness informing her he

---

[1] The transcripts from DeSabetino's trial are not part of the record. McCague does not dispute the trial court's recitation of the proceedings, and does not claim that the trial court incorrectly quotes or mischaracterizes the transcript from those proceedings.

[2] *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

would be removing his name from the witness's case. 1925(a) Op. at 7-8. The court found that the letter "was printed directly from [McCague's] computer and could have been drafted at any point in time" and noted that "[t]here was no indication that it had ever been mailed." *Id.* at 8.[3] The trial court found McCague's claim that the witness was a prospective client to be not credible. N.T., 11/15/18, at 20.

At the conclusion of the hearing, the trial court found McCague in direct criminal contempt, pursuant to 42 Pa.C.S.A. § 4132(3). The court found as facts that McCague committed misconduct before the court and that he acted with intent to obstruct the proceedings:

> [Y]ou have committed misconduct before this Court in how you handled this entire matter. That it was done with the intent to obstruct the proceedings, which I base in part on the fact that you knew all this and you never bothered to say anything until after the direct, the timing is very suspect. And I believe that it was your intent to obstruct the proceedings.
>
> You had certainly mentioned off the record in the morning that more time could be appreciated because your client had mental illness, he had issues, which made me believe you might be seeking a continuance, which you weren't going to be granted. What better way to get a continuance.
>
> Also, your misconduct certainly obstructed the administration of justice and this trial had to be declared after a jury was selected, after 15 witnesses had to be subpoenaed, after enumerable costs were incurred by the court. Therefore, sir, I do find you in criminal contempt.

---

[3] The letter also is not part of the certified record.

N.T., 11/15/18, at 21. It ordered that McCague pay the costs of the prosecution, which included the court costs and the cost of court-appointed counsel, for a total of $4,846.42. *Id.* at 26-28. McCague asked the court to allow him to pay the sanction over three months, and the court agreed. *Id.* at 28-29. McCague filed a timely Notice of Appeal.

McCague raises the following issues:

1. Was there direct criminal contempt in this case?
2. Was there indirect criminal contempt in this case?
3. Was there criminal contempt at all?
4. Was the fine excessive in this case?

McCague's Br. at 2 (suggested answers and some capitalization omitted).

McCague first argues that the court erred in finding him in direct criminal contempt because he did not violate any court order. He further argues he did not intend to obstruct justice and therefore could not be found in direct criminal contempt under 42 Pa.C.S.A. § 4132(3).

Courts have the inherent authority "to impose summary punishment for contempt." ***Commonwealth v. Moody***, 125 A.3d 1, 9 (Pa. 2015). Subsection 4132(3) of the Judicial Code provides, "The power of the several courts of this Commonwealth to issue attachments and to impose summary punishments for contempts of court shall be restricted to the following cases: . . . The misbehavior of any person in the presence of the court, thereby obstructing the administration of justice." 42 Pa.C.S.A. § 4132(3). In sum, "courts have inherent power and statutory authority to impose summary punishment for

direct criminal contempt for willful misconduct that occurs in the presence of the court and obstructs its fair and orderly process." **Moody**, 125 A.3d at 9. A court can impose a summary conviction for direct criminal contempt where it finds beyond a reasonable doubt that the individual "(1) committed misconduct; (2) in the presence of the court; (3) with the intent to obstruct proceedings, and (4) the misconduct actually obstructed proceedings." **Commonwealth v. Pruitt**, 764 A.2d 569, 575 (Pa.Super. 2002). We will not disturb a trial court's finding of contempt "absent an abuse of discretion." **Moody**, 125 A.3d at 12 (quoting **Commonwealth v. Baker**, 766 A.2d 328, 331 (Pa. 2001)).

The trial court found McCague's explanation at the contempt hearing not credible. The court found "extremely suspect" the timing of the revelation that the witness was his client, that is, that he "did not raise the issue until after he received a preview of [the witness's] testimony on direct-examination." 1925(a) Op. at 11-12. It noted that McCague included no qualifiers when he said, "I do represent Amy on another case," and he remained silent when the court reiterated that the issue was that McCague actively represented the witness. **Id.** at 12. The court further found McCague's explanation as to why the witness was not a client for a **Gagnon II** hearing, that is, because she could not pay him, to be unpersuasive. **Id.** The court noted McCague agreed to represent DeSabetino without payment for a weeklong jury trial. **Id.** The court stated that it "remain[ed] steadfast in its belief that [the witness] was not only a prospective client." **Id.** It noted that the witness was responsible

for generating the attorney-client relationship with DeSebetino and stated the court could "never know the genuine extent of their relationship or the nature of the conversations that were had." *Id.* The court concluded that McCague "misbehaved by representing a major Commonwealth witness during the trial of a [d]efendant whom he represented," that the misconduct was committed in the presence of the court, and that McCague "either knew or should have been aware that his conduct was wrongful," and that the "misconduct actually obstructed the administration of justice because it resulted in the declaration of a mistrial." *Id.* at 14. The court pointed out that McCague had told the court at the start of the trial that he would have "appreciated" more time before the start of the trial, and that the mistrial provided such time. *Id.* at 8, 12.

We conclude the court did not abuse its discretion. After a review of the briefs, the relevant law, and the well-reasoned opinion of the Honorable Beth A. Lazzara, we adopt the trial court's reasoning. *Id.* at 9-14. Because the trial court found McCague in direct criminal contempt and we find it did not abuse its discretion in doing so, we need not reach McCague's next two issues— whether indirect criminal contempt or any criminal contempt occurred.

In his final issue, McCague argues that the sanction was excessive. He claims this is so because the maximum penalty for a summary offense is 90 days' incarceration or a $300 fine.

Pennsylvania courts have the power "to issue attachments and to impose summary punishments for contempts of court" where, among other things, "[t]he misbehavior of any person in the presence of the court . . .

obstruct[s] the administration of justice." 42 Pa.C.S.A. § 4132(3). "[T]he punishment of commitment for contempt provided in section 4132 (relating to attachment and summary punishment for contempts) shall extend only to contempts committed in open court. All other contempts shall be punished by fine only." 42 Pa.C.S.A. § 4133.

McCague claims that the maximum fine that the court could impose was $300. He, however, cites no authority to support this proposition, and we are aware of none. Furthermore, and contrary to McCague's argument, the word "summary" in Section 4132 does not set the grading of direct criminal contempt, as McCague contends. Rather, it describes the procedures the court may employ to find direct criminal contempt and impose sanctions for such contempt. **See generally Ricci v. Geary**, 670 A.2d 190, 193 n.1 (Pa.Super. 1996) (citing **Commonwealth v. Stevenson**, 393 A.2d 386 (Pa. 1978)). In any event, the sanction was not excessive. The transcript makes it clear that, in determining the amount of the sanction, the trial court used the actual costs of the proceedings that were declared a mistrial. The court referred on the record to the cost of: having the jury pulled; having the jury return the next day; the minute clerk, the tipstaff, and the court reporter for one-day; witness fees; and an appointed attorney for a non-homicide jury trial, and imposed the sum of those costs. This claim fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/29/2019

ORIGINAL

Criminal Division
Dept. Of Court Records
Allegheny County, PA

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,

μD
ec No. 2018-5473

v.

RICHARD J. MCCAGUE,

Defendant.

OPINION

BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Mike W. Streily, Esq.
Office of the District Attorney
401 Courthouse
Pittsburgh, PA 15219

Richard J. McCague, Esq.
5500 Beverly Place
Pittsburgh, PA 15206

IN THE COURT OF COMMON PLEAS ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,       CRIMINAL DIVISION

vs.                         MD: 2018-5473

RICHARD J. MCCAGUE,

        Respondent.

## OPINION

This is a direct appeal from an order entered on November 15, 2018, finding the Respondent in Direct Criminal Contempt pursuant to 42 Pa. C.S.A. §4132(3). On October 31, 2018, a Rule to Show Cause was issued providing notice to the Respondent of the date and time of the Show-Cause Hearing, as well as the conduct that necessitated the hearing. Specifically, the Respondent was advised to "show just cause why he should not be found in Direct Criminal Contempt of Court pursuant to 42 Pa. C.S.A. §4132(3)" for "his actions of simultaneously representing a criminal defendant and a central Commonwealth witness during a criminal trial that began on October 23, 2018, at CC# 2014-13014."

Following the Show-Cause Hearing held on November 15, 2018, the Respondent was found in Direct Criminal Contempt pursuant to 42 Pa. C.S.

1

§4132(3). The Respondent was fined $4,847.02, an amount reflecting the actual costs that were incurred as a result of the mistrial that he caused due to his misconduct. The fine was ordered to be paid in equal monthly installments over the course of three (3) months, with the first payment due thirty (30) days after sentencing. This appeal followed.

On January 17, 2019, the Respondent filed a Concise Statement of Errors Complained of on Appeal ("Concise Statement"), challenging this court's finding of Direct Criminal Contempt. (Concise Statement, 1/17/19, pp. 2-3). The Respondent argues that the court erred by proceeding with a charge of Direct Criminal Contempt, that the record lacked evidence to support such a finding, and that the fine imposed was "harsh and excessive." (Id.). The allegations of error lack merit. For the reasons that follow, the reviewing court respectfully should uphold the contempt finding and the sentence imposed.

## I.   FACTUAL BACKGROUND

The contempt proceeding arose out of the trial in Commonwealth v. Richard DeSabetino, at CC No. 2014-13014, which began on October 23, 2018. Respondent represented the Defendant at trial. The allegations against the Defendant involved a police chase that transpired after officers attempted to arrest the Defendant pursuant to an active warrant. One of the

2

Commonwealth's key witnesses, Amy Calabrese, (also known as Amy Fulford), was dating and residing with the Defendant at the time of the August 6, 2014 incident. (Trial Transcript ("TT"), held 10/23/18, p. 74). Ms. Calabrese was one of two (2) people who witnessed the events leading up to the police chase, and the Commonwealth's opening argument referenced Ms. Calabrese's expected testimony. (TT, pp. 56-57, 60, 98).

In his opening argument, the Respondent asked the jury to keep an open mind about the events leading up to the chase. (TT, p. 65). In conceding that a chase did occur, the Respondent argued that "[t]he question is how does [the Defendant] get to be there and what led him to that position." (Id.). "We believe, we sincerely believe, that we are going to be able to show you how he got to that position, and I think you will be able to understand that that makes him not guilt[y] of a great many things." (Id.). Later in his opening, the Respondent again referenced the importance of the sequence of events leading up to the chase and how the conduct of the police officers "contributed to the problem" that day. (TT, p. 67).

Ms. Calabrese was called as the Commonwealth's first witness. She completed her direct examination before the lunch recess. (TT, pp. 68-95). After the jury was led out of the room, the Respondent informed the court of

3

a matter he wished to bring to its attention. (TT, p. 96). The Respondent then stated that he did not "anticipate this being a problem," but that he wanted to make the court aware that he represents Ms. Calabrese on a different case. (TT, p. 96). The Respondent's exact words were, "I do represent Amy on another case." (TT, p. 96). Incredulous at his admission that he actively represents an important Commonwealth witness, the court asked whether he learned of Ms. Calabrese's involvement in this case through discovery. (TT, p. 96). The Respondent replied, "[i]t's how I got to this client, Your Honor." (Id.). The court recessed for lunch and spent the following hour researching the issue and deliberating about how to proceed.

After lunch, but before the jury returned to the courtroom, the court summarized its understanding of the issue as the Respondent *actively* representing Ms. Calabrese in a separate case during his representation of the Defendant. (TT, pp. 97-102). The following exchange took place:

> *The Court*: . . . I think it's reflected on the record, an offhand remark was made by [the Respondent] about the fact that he didn't think it was a big deal, but **that he represents - - I believe that was said in the present tense** - - the Commonwealth's main witness who has testified so far Amy Fulford . . . .
>
> * * *
>
> *The Court*: You know, Mr. McCague, you don't think it's a big deal. This is a huge deal, okay. This is one of two witnesses to the start of this entire interaction, which you already told the jury is going to be the main crux of your defense. The start of this interaction

4

is going to the main crux of your defense, and **you represent** one of the Commonwealth's two witnesses that can testify as to the start of that defense.

Mr. McCauge: Yes, Your Honor.

*The Court*: And you didn't reveal it at any time up until this point. You got involved in this case about a month ago. You didn't reveal it at that point in time, let alone the fact --let's make sure the record is clear – you also indicated that this is how you got involved in the case, is through Ms. Amy Fulford. Is that correct?

Mr. McCague: I believe that is correct, You Honor.

*The Court*: Okay. So you get involved in the case because of your representation of her. You get involved in the case a month ago. You don't tell this Court, which would have been a nice thing to do. We actually had a hearing before Mr. Walker was let out of this case to make sure that you understood the parameters of this case, which was that it would not be postponed, it would proceed, that this Court would not appoint another attorney. [The Defendant] had his last one with Mr. Walker.

At no time did you ever make clear to this Court that you had an interest in the Commonwealth's witness; at no time. I am assuming, Ms. Robb, that at no time was it made clear to you in any way, shape, or form that Mr. McCague represented your witness.

Ms. Robb: That's correct, Your Honor.

*The Court*: So now we are ready to do cross-examination of this witness. I don't know what this witness – what you concocted with this witness that –

Mr. McCague: Your Honor, I haven't –

*The Court*: Mr. McCague, I don't know that. That's the problem. I could ask her a million times under oath, I could ask you a million times under oath, I could ask Mr. DeSabetino a million times under oath at this point and nobody would tell me the truth. I have no idea whether there is something being concocted for cross-examination. I have no idea whether you will effectively cross-examine her on behalf of Mr. DeSabetino, because you have a prior relationship with her. You may not go after her aggressively for fear of hurting any of the cases that she currently has. How can I be assured that you will give Mr. DeSabetino his due? At this

5

point, I cannot be sure of that. Mr. DeSabetino cannot be sure of that. Again, I can ask you, I could ask him, I could ask her and still, I don't know. That's the position you have put this Court in at this point in time on a case that has been sitting here since 2014. On a case that has a difficult defendant involved, who, if he is convicted, I have no doubt will take full advantage of his appella[te] righs and his PCRA rights, and you have just created a PCRA issue for [p]otential Ineffective Assistance of Counsel.

We cannot tell whether or not you will effectively cross-examine her, because she is also your client. And one of only two Commonwealth witnesses that can talk about how this entire matter started, which is the crux of your defense. You see where there is a problem, Mr. McCague?

Mr. McCague: Yes, Your Honor. I see there's a problem. I did get waivers from both parties. I thought that would cover it.

*The Court*: First of all, none of us are aware of this situation. You can say you have waivers, but again, since this sprung on the Court at the point where she has already done her direct, did you think you might want to tell us about this before we started the case? Did you think that perhaps that would have been the most appropriate means to handle this That's not a rhetorical question. That's a real question that demands an answer.

Mr. Mccague: It certainly would have been, Your Honor.

*The Court:* At this point, I don't believe that I have any choice but to declare a mistrial. You will now be removed from this case. . . .

(TT, pp. 97-102) (emphasis added).

At no point during that exchange did the Respondent object to the characterization that he actively represented Ms. Calabrese. (TT, pp. 96-102). After declaring the mistrial, the court recused itself from the case and informed Mr. McCague that he was no longer welcome in its courtroom. (TT, p. 102).

6

After providing sufficient notice to the Respondent, a contempt hearing was held on November 15, 2018. (Contempt Hearing Transcript ("HT"), held 11/15/18). The court summarized the history of the underlying case, as well as the Respondent's conduct which gave rise to the contempt hearing. (HT, pp. 3-11). Despite his statement, "I do represent Amy on another case" made at the time that he initially disclosed the issue, the Respondent indicated for the first time that Ms. Calabrese was only a prospective client who had never retained him. (HT, pp. 12-13). When questioned why he did not attempt to explain that she was only a prospective client before the declaration of the mistrial, the Respondent apologized, claimed that he had "misspoke" and insisted that he had never formally represented her. (HT, pp. 13-19).

The Respondent then presented a "discontinuation letter" dated July 13, 2018, that he purportedly sent to Ms. Calabrese informing her that he was not taking her case because she could not pay him. (HT, pp. 12-14, 17). The substance of the letter is as follows:

> Dear Amy, I have spoken with Dave at the phone number that you gave me and he insisted that there was no money coming forth. He said that the "few dollars" that you have were already gone and you didn't have any money for me. He also insisted that he didn't have any information from you that I was to get anything.

7

I am taking him at his word, and I will not be calling him anymore. This means, however, that you cannot pay me and that you probably knew that all along. He is not a source for paying me.

I will be filing to remove my name from your case. I do not know what else to do. I will not tell either Judge Borkowski, nor his secretary why.

("Discontinuation Letter" – dated July 13, 2018).

The letter, however, was printed directly from the Respondent's computer and could have been drafted at any point in time. (HT, pp. 17, 25). There was no indication that it had ever been mailed. (HT, pp. 17, 25). In light of all the circumstances, the court did not find the Respondent's explanation of the matter to be credible. Instead, the court focused on his statements and conduct at the time his initial disclosure was made. (HT, pp. 14, 17, 20, 24-25). Accordingly, the court found the Respondent in Direct Criminal Contempt pursuant to 42 Pa. C.S. 4132(3), and stated the following:

And I make that specific finding, that you are in criminal contempt. That you have committed misconduct before this Court in how you handled this entire matter. That it was done with the intent to obstruct the proceedings, which I base in part on the fact that you knew all this and you never bothered to say anything until after the direct, the timing is very suspect. And I believe that it was your intent to obstruct the proceedings. You had certainly mentioned off the record in the morning that more time could be appreciated because your client had mental illness, he had issues, which made me believe you might be seeking a continuance, which you weren't going to be granted. What better way to get a continuance. Also, your misconduct certainly obstructed the administration of justice and this [mis]trial had to be declared after a jury was selected, after 15 witnesses had to be subpoenaed, after enumerable costs were incurred by the court. Therefore, sir, I do find you in criminal contempt.

8

(HT, pp. 20-21).

Prior to the imposition of sentence, the court ensured that the Respondent did not want to proceed with the assistance of an attorney. (HT, p. 22). The court then fined the Respondent $4,847.02, to reflect the amount of court costs incurred by Allegheny County as a result of the mistrial. (HT, pp. 26-29).

## II. DISCUSSION

### A. This court properly proceeded with a charge of Direct Criminal Contempt and its contempt finding is supported by the record.

"When reviewing a contempt conviction, much reliance is given to the discretion of the trial judge. Accordingly, [the reviewing court is] confined to a determination of whether the facts support the trial court decision." Williams v. Williams, 681 A.2d 181, 183 (Pa. Super. 1996), affirmed, 721 A.2d 1072 (Pa. 1998). "A trial court's finding of contempt will not be disturbed absent an abuse of discretion." Commonwealth v. Moody, 125 A.3d 1, 12 (Pa. 2015) (internal quotations and citations omitted); Ricci v. Geary, 670 A.2d 190, 191 (Pa. Super. 1996) ("We will reverse a trial court's determination only when there has been a plain abuse of discretion."). "In cases of direct criminal contempt, that is, where the contumacious act is committed in the presence

9

of the court and disrupts the administration of justice, an appellate court is confined to an examination of the record to determine if the facts support the trial court's decision." Commonwealth v. Jackson, 532 A.2d 28, 31-32 (Pa. Super. 1987).

Contrary to the Respondent's argument, his conduct was actionable as a Direct Criminal Contempt as opposed to Indirect Criminal Contempt, because Indirect Criminal Contempt occurs only when there is a "violation of a court order that occurred outside of the court's presence." Commonwealth v. McMullen, 961 A.2d 842, 849 (Pa. 2008). The contempt proceeding in this case properly was initiated pursuant to 42 Pa. C.S.A. § 4132(3), which empowers the court to impose summary punishment for "misbehavior of any person in the presence of the court, thereby obstructing the administration of justice." A summary conviction for Direct Criminal Contempt under §4132(3) requires a finding beyond a reasonable doubt that the individual "(1) committed misconduct, (2) in the presence of the court, (3) with the intent to obstruct the proceedings, and (4) [the] misconduct actually obstructed the administration of justice." Commonwealth v. Pruitt, 764 A.2d 569, 575 (Pa. Super. 2000).

Our Supreme Court has explained that "a subjective intent to obstruct the administration of justice is not a requisite element of criminal contempt." Commonwealth v. Owens, 436 A.2d 129, 133 (Pa. 1981). "The requisite element of intent is satisfied if the contemnor had the intent to obstruct the proceedings. When that intent manifests itself in misconduct in the presence of the court which . . . in fact obstructs the administration of justice, criminal contempt has been committed." Owens, supra, at 133. "There is wrongful intent if the contemnor knows or should reasonably be aware that his conduct is wrongful." In re Adams, 645 A.2d 269, 272 (Pa. Super. 1994) (internal citations omitted). "It does not matter that appellant was acting in good faith by zealously defending his client." Id. at 272.

This court did not abuse its discretion in finding the Respondent in Direct Criminal Contempt pursuant to §4132(3). Simply put, this court did not find the Respondent's explanation at the contempt hearing, or the self-serving discontinuation letter he offered, to be credible considering the totality of the circumstances.

First, the court found the timing of the revelation regarding his relationship with Ms. Calabrese to be extremely suspect. (HT, p. 18). Indeed, the Respondent had let the court know at the beginning of trial that he would

11

have appreciated having more time on the case. (HT, p. 21). Then, despite having ample opportunity to notify the court of the issue prior to the beginning of trial, the Respondent did not raise the issue until after he received a preview of Ms. Calabrese's testimony on direct-examination. (TT, p. 96); (HT, pp. 18-19). When the Respondent did bring the matter to the court's attention, the first statement he uttered was, "I do represent Amy on another case." (TT, p. 96). There were no qualifiers attached. Even when the court came back from lunch and reiterated that the issue involved the Respondent's *active* representation of the witness, he remained silent and did not seek to clarify that Ms. Calabrese had been a prospective client only. (TT, pp. 96-102); (HT, p. 15). The Respondent's statements and conduct at the time of the disclosure were what this court found to be the most credible. (HT, pp. 14, 17, 20, 24-25).

Second, the Respondent's explanation for why Ms. Calabrese remained only a prospective client was because she could not afford to hire him for a Gagnon II Hearing. (HT, p. 14-15). However, this explanation was not at all persuasive given that he had agreed to represent Mr. DeSabetino without any hope of payment for a week-long jury trial involving serious charges. (HT, p. 15).

12

The court remains steadfast in its belief that Ms. Calabrese was not simply a prospective client. In any event, Ms. Calabrese was responsible for generating his attorney-client relationship with the Defendant, and this court can never know the genuine extent of their relationship or the nature of the conversations that were had. That is why this court believed that any hearing into that matter would have been futile. A hearing would have been an inadequate gauge of the psychological component involved with respect to the potential for Ms. Calabrese to subconsciously alter her testimony in response to questioning by the Respondent, especially when she was the one who had arranged for his representation of the Defendant.

Pursuant to Rule 1.7 of the Rules of Professional Conduct, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." A concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." Rule 1.7(a)(2) of R.P.C. "Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." Rule 1.7(b)(1).

13

The court found that the Respondent misbehaved by representing a major Commonwealth witness during the trial of a Defendant whom he represented. At the contempt hearing, the court explained the problem as such:

> When this kind of behavior happened, Mr. DeSab[e]tino wasn't going to be given a fair shot. You have knowledge of Ms. Calabrese that makes it hard to cross-examine her at that point in time. Is Ms. Calabrese going to be given a fair shot? Are you going to use things that she told you in order to get a leg up for Mr. DeSab[e]tino? That's why we never proceed this way, so that those people who come in here can believe that the court system is fair and is working to the best of its ability on their behalf[]. And that is not what you did. It is not what you did.

(HT, p. 24).

The Respondent's misconduct was committed in the presence of the court, and the Respondent either knew or should have been aware that his conduct was wrongful. His misconduct actually obstructed the administration of justice because it resulted in the declaration of a mistrial. Accordingly, there is sufficient evidence to sustain the Respondent's direct criminal contempt conviction under §4132(3), and the court respectfully requests that the conviction be upheld.

14

**B. The fine was reasonable and was imposed after a determination of the Respondent's financial ability to pay.**

Pursuant to 42 Pa. C.S.A. § 4133, the Respondent was fined only for the actual costs associated with the mistrial that he caused because that amount was sufficient to address his misconduct. In imposing a fine, the court conducted an inquiry into the Respondent's ability to pay and whether such a fine would pose any undue financial hardship. (HT, pp. 26-29). The court offered to accept a payment plan, and it allowed the Respondent to dictate the terms of that payment plan. (HT, p. 28). The Respondent never indicated that he would be incapable of paying the fine or that any such fine would cause any undue hardship. (HT, pp. 28-29). He simply said, "I'll deal." (HT, p. 29). Accordingly, the fine in this case was not unduly harsh or excessive and was narrowly tailored to address the specific misconduct in this case.

## III. **CONCLUSION**

The court properly characterized the Respondent's misconduct as a Direct Criminal Contempt under 42 Pa. C.S.A. § 4132(3), there was sufficient evidence to support the contempt finding, and the sentence imposed was reasonable under the circumstances.

BY THE COURT:

_____, J.
BETH A. LAZZARA, JUDGE

_____
DATE        4/16/19

16